**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**

IN RE:

**Case No. 19-11428-JDW**

**J.T. SHANNON LUMBER COMPANY, INC.,**

**Chapter 11**

Debtor.

**DISCLOSURE STATEMENT**
**OF**
**J.T. SHANNON LUMBER COMPANY, INC.**

**GLANKLER BROWN, PLLC**

/s/ Michael P. Coury
Michael P. Coury (MS #103809)
6000 Poplar Avenue
Suite 400
Memphis, TN 38119
(901) 576-1886
(901) 525-2389 facsimile
mcoury@glankler.com
*Attorneys for J.T. Shannon Lumber Company, Inc.*

1

# I.

# **INTRODUCTION**

The Debtor, J.T. Shannon Lumber Company, Inc. (the "*Debtor*"), provides this Disclosure Statement to all known creditors to disclose that information deemed by the Debtor to be material, important and necessary for his creditors to arrive at a reasonably informed decision in exercising their right to vote for acceptance of the Plan of Reorganization (the "*Plan*"). Neither the Debtor nor the Bankruptcy Court has authorized the communication of any information about the Plan other than the information contained in this Disclosure Statement and the related materials transmitted herewith or filed with the Bankruptcy Court. No solicitation of votes on the Plan from a Creditor in an Impaired Class may be made, unless, at the time of or before such solicitation, this Disclosure Statement, in the form approved by the Bankruptcy Court for dissemination, is transmitted to such Persons.

**NO REPRESENTATIONS CONCERNING THE DEBTOR (PARTICULARLY AS TO ITS FUTURE BUSINESS OPERATIONS, VALUE OF PROPERTY, OR THE PLAN) ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE WHICH ARE OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISIONS, AND SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR WHO IN TURN SHALL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE DEEMED APPROPRIATE. THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. THE RECORDS KEPT BY THE DEBTOR ARE DEPENDENT UPON INTERNAL ACCOUNTING PERFORMED BY THE DEBTOR. FOR THE FOREGOING REASON, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY. IN ADDITION TO THIS DISCLOSURE STATEMENT, THE ATTACHED PLAN OF REORGANIZATION SHOULD ALSO BE REVIEWED FOR A BETTER UNDERSTANDING OF THE TREATMENT**

OF ALL CLASSES OF CREDITORS.  THE PLAN IS INCORPORATED HEREIN BY REFERENCE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTOR IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE.   NO REPRESENTATIONS BY ANY PERSON OR ENTITY CONCERNING THE DEBTOR, HIS OPERATIONS, FUTURE SALES, PROFITABILITY, VALUES OR OTHERWISE, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT, HAVE BEEN AUTHORIZED.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BELIEVED TO BE CORRECT AT THE TIME OF THE FILING OF THIS DISCLOSURE STATEMENT. ANY INFORMATION, REPRESENTATION, OR INDUCEMENT MADE TO SECURE OR OBTAIN ACCEPTANCES OR REJECTIONS OF THE PLAN WHICH ARE, OTHER THAN, OR ARE INCONSISTENT WITH, THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR OTHER MATERIALS AUTHORIZED TO BE TRANSMITTED BY THE BANKRUPTCY COURT SHOULD NOT BE RELIED UPON BY ANY PERSON IN ARRIVING AT A DECISION TO VOTE FOR OR AGAINST THE PLAN.  ANY SUCH ADDITIONAL INFORMATION, REPRESENTATIONS, AND INDUCEMENTS SHOULD BE IMMEDIATELY REPORTED TO THE ATTENTION OF THE DEBTOR AND THE BANKRUPTCY COURT.

EXCEPT WITH RESPECT TO THE PROJECTIONS AND EXCEPT AS OTHERWISE SPECIFICALLY AND EXPRESSLY INDICATED HEREIN, THIS DISCLOSURE STATEMENT DOES NOT REFLECT ANY EVENTS THAT MAY OCCUR SUBSEQUENT TO THE DATE HEREOF AND THAT MAY HAVE A MATERIAL IMPACT ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTOR DOES NOT INTEND TO UPDATE THE PROJECTIONS; NOR DOES THE DEBTOR ANTICIPATE THAT ANY AMENDMENTS OR SUPPLEMENTS TO THIS DISCLOSURE STATEMENT WILL BE DISTRIBUTED TO REFLECT SUCH OCCURRENCES, UNLESS OTHERWISE ORDERED BY THE BANKRUPTCY COURT. ACCORDINGLY, THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT UNDER ANY CIRCUMSTANCE IMPLY THAT THE INFORMATION CONTAINED THEREIN IS CORRECT OR COMPLETE AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN RELATED DOCUMENTS, CERTAIN EVENTS,

**AND CERTAIN FINANCIAL INFORMATION.  WHILE THE DEBTOR BELIEVES THAT THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS.  EXCEPT AS OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY A REVIEW OF THE CERTAIN PARTS OF THE RECORD IN THE CASE AND BY CERTAIN PERSONS HAVING A FAMILIARITY WITH THE DEBTOR'S BUSINESS.  THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO AN AUDIT.  NEITHER THE DEBTOR NOR COUNSEL FOR THE DEBTOR ARE ABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY INACCURACY OR OMISSION.**

As a Creditor or interest holder, your vote is important.  The Plan can be confirmed by the Court if it is accepted by the holders of two-thirds (2/3) in amount and more than one-half (1/2) in number of claims in each impaired Class of claims or interests voting on the Plan.  The Plan may also be confirmed over the objection of a creditor and despite a class' rejection of the plan in accordance with 11 U.S.C. § 1129(b).  The purpose of this statement is to provide the holders of claims against or interests in the Debtor with adequate information about the Debtor and the Plan to make an informed judgment when voting on the Plan.

## II.

### FINANCIAL INFORMATION CONCERNING THE DEBTOR

### A.  DEBTOR'S BUSINESS HISTORY

The Debtor, J.T. Shannon Lumber Company, Inc. ("Debtor" or "JTSLC"), a Mississippi corporation, is a highly recognized leader in the hardwood lumber industry and has been in business since 1982.  Over the years, JTSLC and its subsidiaries has been one of the most innovative and trusted suppliers of North American hardwood products in the world.  Currently, JTSLC employs approximately 50 individuals.

The Debtor's President, Chief Executive Officer and 100% shareholder is Jack T. Shannon, Jr. JTSLC's sole director is Jack T. Shannon, Jr. .

JTSLC owns the following subsidiaries:

(a) Shamrock Wood Industries, Inc. ("Shamrock") – Shamrock was formed in 1999 to manufacture hardwood flooring in facilities owned by JTSLC. Shamrock ceased operations on March 31, 2019.

(b) Mill Direct Hardwood, Inc. ("MDH") – MDH formed in 1998. MDH engages in the business of lumber brokerage. MDH is not presently engaged in active operations.

(c) Timberland Resources, Inc. ('Timberland") – Timberland was formed in 1999 to engage in the business of hardwood sawmilling. Timberland ceased operations in February of 2017.

(d) J.T. Shannon Trucking, Inc. ("Shannon Trucking"). Shannon Trucking was formed in 2008 to provide transportation of lumber products sold by JTSLC, Shamrock and other JTSLC subsidiaries. Shannon Trucking ceased operations in 2019.

(e) Marshall County Hardwood, Inc. ("MCH") – MCH was formed in 2006 to engage in the business of  hardwood sawmilling. MCH ceased operations in May 2008.

### B.  DEBTOR'S ASSETS AND LIABILITIES

The Debtor's principal assets consist of its real estate and machinery and equipment located at its facility in Horn Lake, Mississippi. JTSLC's Facility consists of 19 buildings containing 266,760 square feet located on 29.383 acres located at 2200 Cole Road, Horn Lake,

Mississippi. JTSLC estimates the fair market value of real estate to be $5,870,000 and the fair m

market value of the machinery, equipment and vehicles to be $5,335,997.

1.    **Assets.**    The specific assets owned by the Debtor and their corresponding fair

market/ going concern values as of April 1, 2019 are as follows:

| | | | |
|---|---|---|---|
| a. | Bank Accounts - | $ | 30, 498.00 |
| b. | Prepayments | $ | 9,780.00 |
| c. | Interests in subsidiaries | $ | 0.00 |
| d. | Inventory | $ | 60,000.00 |
| e. | Office furniture/computers | $ | 59, 424.67 |
| f. | Machinery/ Equipment/Vehicles | $ | 5,335,997.00 |
| g. | Real estate | $ | 5,870,000.00 |
| | | **Total -** | **$11,485,235.67** |

2.    **Liabilities.**    The Debtor's liabilities are categorized and prioritized as (a)

administrative expense claims; (b) pre-petition secured claims; (c) pre-petition unsecured priority

claims, and (d) pre-petition unsecured nonpriority claims and the Debtor has ascribed the

following amounts to these categories of liabilities:

| | | | |
|---|---|---|---|
| a. | Administrative Expense Claims- Professionals - | $ | 50,000.00 |
| | *Total Administrative* | *$* | *50,000.00* |
| c. | Pre-petition  Secured Claim of Triumph Bank | $ | 8,502,552.87 |
| d. | Pre-petition Secured Claim of TCF Equipment Finance | $ | 52,115.76 |
| e. | Pre-Petition Secured Claim of Toyota Commercial Finance, Inc. | $ | <u>33,638.00</u> |
| | *Total Secured* | *$* | *8,488,306.64* |
| f. | Estimated Pre-petition Unsecured Priority Claims | $ | 258,971.50 |
| j. | Estimated Pre-petition Unsecured Non-Priority Claims | | $5,909,759.41 |

*Total Priority/Non-Priority Unsecured*    **$ 6,168,730.91**

## C.  DEBTOR'S OPERATIONS

The Debtor's principal secured bank is Triumph Bank ("Triumph"). The Debtor is jointly and severally liable to Triumph for pre-petition loans made to the Debtor and Shamrock. Due to sustained operating losses incurred by Shamrock during the four year period prior to the Petition Date, the Debtor lacked availability under its line of credit with Triumph to purchase lumber inventory to process for JTSLC customers. As a result of its inability to satisfy customer orders, JTSLC's customer base began to shrink. In order to sustain its ongoing operation, JTSLC entered into a Processing Agreement dated November 1, 2018 with Anderson-Tully Lumber Company ("ATCO"), a customer of the Debtor. Pursuant to the Processing Agreement, the Debtor processes lumber inventory owned by ATCO for a negotiated fee. Pursuant to the Processing Agreement, ATCO was given a right of first offer to purchase the assets of the Debtor in the event of a sale of the Debtor's assets.  The Processing Agreement expires on October 31, 2021. The Processing Agreement grants ATCO the right to terminate the agreement on the second anniversary of the agreement with a prior written sixty day notice. In the event of early termination, the Processing Agreement requires ATCO to pay the Debtor an early termination fee of $400,000.

Since entering into the Processing Agreement, the U.S. hardwood lumber industry has been adversely impacted by trade tariffs imposed by the U.S. government against China. The trade tariffs resulted in the Chinese government imposing reciprocal import tariffs on the importation of U.S. hardwood lumber species. As a result, U.S. exports of hardwood lumber products has declined significantly during 2019.  This decline, in turn, has impacted the volume of lumber being provided by ATCO for processing by the Debtor under the Processing Agreement.

On February 28, 2020, it was announced that Chinese import tariffs on certain species of U.S hardwood lumber will be lifted for a period of one year. As of the filing of this disclosure statement, there is still confusion and uncertainty the short term impact of this change on the U.S. hardwood industry, though it is considered positive for the industry.

Since entering into the Processing Agreement, the Debtor's average monthly gross revenue has been $350,000.00. The volume realized has been less than what was anticipated by the Debtor when it entered into the Processing Agreement. The Debtor's 2020 calendar year gross revenue is estimated to be in excess of $4,200,000. The Debtor projects average annual gross revenue of $4,200,000 for 2021 and total projected cumulative cash flow before plan payments over the next 21 months of approximately $ 153,980. A summary of the Debtor's projected cash flow budget is set forth in ***Exhibit 1.***

### D. FACTORS CONTRIBUTING TO FILING CHAPTER 11 CASE

For many years, JTSLC and its subsidiaries operated profitably. During the mid-2010's, however, the hardwood lumber industry and hardwood flooring industries was negatively impacted by increased competition in foreign markets, principally in China. JTSLC had made substantial capital investments in Shamrock, which owned significant amounts of equipment used to manufacture hardwood flooring. As a result, between 2015 and 2019, Shamrock incurred substantial operating losses in its flooring business. Shamrock's losses were $(1,919,343) in 2015, $(3,155,967) in 2016, $(2,696,142) in 2017, and $(3,427,038) in 2018. In order to keep Shamrock operating, JTSLC made loans to Shamrock. As of the date of the petition, Shamrock was indebted to JTSLC in the amount of $ 2,135,949 on account of shareholder loans made to Shamrock.

8

JTSLC and Shamrock were jointly and severally liable to Triumph Bank for loans made to each business. Because of the continued operating losses of Shamrock and overall decline in the hardwood lumber industry during 2017 -2018,  JTSLC's loan availability under its revolving line of credit with Triumph declined. As a result, JTSLC entered into the Processing Agreement with ATCO.

Because of the Debtor's loss of business and declining cash flow, the Debtor was not able to remain current with obligations owed to its trade creditors. As a result, several lawsuits were filed by trade creditors against the Debtor. These lawsuits, combined with the other factors described above, contributed to the Debtor seeking bankruptcy protection.

**III.**

**<u>SUMMARY OF PLAN OF REORGANIZATION</u>**

The Debtor believes that the interests of creditors will be best served if the Plan is approved and payments to creditors are made in accordance with the Plan.

A.    **<u>Unclassified Claims.</u>**    Certain types of claims are automatically entitled to specific treatment under the Code.  They are not considered impaired, and holders of such claims do not vote on the Plan.  They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code.  As such, the Plan Proponent has *not* placed the following claims in any class:

1.    ***<u>Administrative Expenses</u>.***    Administrative expenses are costs or expenses of administering the Debtor's chapter 11 case which are allowed under § 507(a) (2) and § 503(b) of the Code.  Administrative expenses also include the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before the date of the bankruptcy

petition.  The Code requires that all administrative expenses be paid on the effective date of the Plan, unless a particular claimant agrees to a different treatment.

Allowed Administrative claims shall be paid in cash, in full on the Effective Date of the Plan or upon such other terms as may be agreed upon by the holder of the claim and the Debtor. Any administrative clams representing liability incurred in the ordinary course of business of the Debtor may be paid in cash in the ordinary course of business in accordance with ordinary trade terms between the Debtor and creditor.   Included in this class are the attorneys' fees and management fees incurred by the Debtor. Any United States Trustee Quarterly Fees under 28 U.S.C. § 1930(a)(6) due and owing or assessable prior to confirmation shall be paid in full on the Effective Date of the Plan and any further such fees shall be paid in accordance with 28 U.S.C. § 1930(a)(6).  After confirmation but prior to the entry of a Final Decree, the Debtor shall file with the Court and serve on the United States Trustee a financial report for each quarter, or portion thereof, for which the case remains open in a format prescribed by the United States Trustee and provided to the Debtor by the United States Trustee.

2.       ***Priority Tax Claims***.   Priority tax claims are unsecured income, employment, property other taxes described by § 507(a) (8) of the Code.  Unless the holder of such a § 507(a)(8) priority tax claim agrees otherwise, it must receive the present value of such claim, in regular installments paid over a period not exceeding 5 years from the Petition Date. A Proof of Claim was filed by the U.S. Customs and Border Protection in the amount of $12, 559.55 for duty bills owed by the Debtor. The DeSoto County Tax Collector filed a priority Proof of Claim in the amount of $135,684.10 for pre-petition real estate and personal property taxes. The foregoing claims will be amortized with statutory interest, if any, and paid over a period of sixty months commencing thirty days following the Effective Date of the Plan. In the

10

event of an early termination of the Processing Agreement between the Debtor and ATCO, any early termination fee paid by ATCO pursuant to the Processing Agreement will be applied first to the satisfaction of unsecured pre-petition priority claims. Upon the sale of the assets of the Debtor pursuant to this Plan, the net proceeds of sale shall be applied first to the payment of priority tax claims and then to the payment of allowed secured claims of any lien holder with an allowed secured claim secured by the sale proceeds.

**B.** **Classification and Treatment of Claims and Interests.** Pursuant to 11 U.S.C. §§ 1122(a) and 1123(a) (1) the Plan divides claims against and interests in the Debtor into the following classes:

**Class 1:** **Pre-petition Secured Claim of Triumph Bank** Class 1 consists of the unpaid balance due to Triumph Bank ("Triumph") under (a) that certain Business Loan Agreement dated August 15, 2014 and Fixed Rate Promissory Note and Commercial Pledge and Security Agreement dated August 26, 2014, in the current amount of $ 1,150,591.72 ; (b) that certain Loan and Security Agreement and Master Revolving Credit Promissory Note  dated March 17, 2017 in the current amount of $ 4,094,566.73; (c) that certain Loan and Security Agreement and Fixed Rate Promissory Note dated March 17, 2017 in the current amount of $854,220.14 and (d) that certain Loan Agreement, Term Note, and Deed of Trust, Security Agreement and Fixture Filing dated December 28, 2017 in the current amount of $2, 403, 174.28. The foregoing documents described in (a) through (d) above constitute the "Loan Documents".  The Loan Documents evidencing Triumph's loans shall be modified as follows: (a) to modify and/or extend the maturity date of all loan obligations for a period of thirty-six (36) months following the Effective Date of this Plan; (b) to provide for the monthly payment of interest only on the indebtedness owed to Triumph at the contractual non-default interest rate

11

pending the earlier of the maturity date of the extended loan obligations or the sale of the Debtor's assets which are subject to Triumph's security interest. Any pre-petition acceleration of indebtedness shall be deaccelerated upon the Effective Date. In the event of the sale of the Debtor's assets which secure the loan obligations, the net proceeds, after deducting the cost of sale, including payment of professionals engaged to sell the assets, and satisfaction of personal and real property taxes attributable to the assets sold,  shall be paid to Triumph Bank to the extent of its indebtedness. In the event of an early termination of the Processing Agreement between the Debtor and ATCO, any early termination fee paid by ATCO pursuant to the Processing Agreement will be applied first to the satisfaction of unsecured pre-petition priority claims and second to the indebtedness owed to Triumph. All other terms of the Loan Documents shall remain in full force and effect. As adequate protection, the Debtor has paid the ongoing post-petition interest payments to Triumph at the contractual rate during the post-petition administrative period of this case.

Class 1 is impaired.

**Class 2:**         **Pre-petition Secured Claim of TCF Equipment Finance**

Class 2 consists of the unpaid balance due to TCF Equipment Finance ("TCF") pursuant to (i) that certain Equipment Finance Agreement dated October 28, 2016 with a current balance of approximately $52, 115. 76 secured by a security interest in two thin cutting frame saws F15. Unless previously surrendered to TCF pursuant to court order prior to the Effective Date, the Debtor shall surrender the two thin cutting frame saws to TCF on the Effective Date to permit TCF to foreclose upon such property Any deficiency claim of  TCF shall be treated as a general unsecured claim in Class 4 of this Plan.

Class 2 is impaired.

**Class 3:** **Pre-petition Secured Claim of Toyota Industries Commercial**

**Finance Inc.**   Class 3  consists of the unpaid balances of $33,638.00 due to Toyota Industries

Commercial Finance, Inc. ("Toyota") pursuant to that certain Master Lease Agreement dated

August 20, 2010 and Schedule No. 9 dated December 28, 2015.   Upon the Effective Date, the

Schedule No. 9 of the Master Lease Agreement shall be assumed, and the Debtor shall continue

to pay according to the terms of the lease. Toyota shall retain its security interest in the two lifts

Model No. 8FD40U according to the terms of Master Lease Agreement and Schedule 9. The

remaining portion of Toyota's claim relating to forklifts surrendered pursuant to Schedule No. 7

shall be treated as a Class 4 unsecured claim.

Class 3 is impaired**.**

**Class 4: Pre-petition General Unsecured Non-Priority Non-Insider Claims.**

Class 4 consists of all allowed General Unsecured Non-Priority Claims including, but not limited

to, pre-petition trade creditors, unsecured creditors whose claims are listed in the Debtor's

schedules but are not listed as disputed, contingent or unliquidated  and unsecured creditors who

have filed proofs of claim which have not been objected to, but excluding Class 5 Claims. Class

4 claims aggregate approximately $ 2,956,225.65, without prejudice to the Debtor's right to

object to any claim.    Allowed Class 4 claims shall receive pro rata quarterly distributions

commencing ninety (90) days following the Effective Date out of the net cash flow of the

Reorganized Debtor until the earlier of (a) such time as such allowed claims have received an

aggregate distribution of 5% of the allowed claim or (b) the termination of the Processing

Agreement/  Upon termination of the Processing Agreement, the assets of the Debtor shall be

sold as provided in this Plan and allowed Class 4 claims shall receive an additional pro rata

distribution out of the net proceeds of sale remaining after satisfaction of Class 1 creditors and

priority creditors until Class 4 claims have received an aggregate distribution of 50% of their allowed claims. Class 4 creditors will share any remaining net proceeds of sale with Class 5 creditor after Class 5 creditors have received a distribution equal to fifty (50) percent of the allowed Class 5 claims.

Class 4 is impaired.

**Class 5:**    **Pre-petition General Unsecured Non-Priority Insider Claims.**

Class 5 consists of the allowed General Unsecured Non-Priority Claims of (a) Amelia Exempt Trust; (b) Amelia Non-Exempt Trust, (c) Forest to Floors, LLC, (d) Harmor, LLC, (e) Jack T. Shannon, (f) Kathryn C. Shannon and (f)  Origin Floor LLC for loans made to the Debtor. The aggregate amount of Class 5 claims is approximately $2, 953, 533.76.. Allowed Class 5 claims shall be paid pro-rata out of any net sale proceeds remaining from the sale of the Debtor's assets following termination of the Processing Agreement after allowed Class 4 claims have received a distribution of 50% as provided in the Plan. Any net sale proceeds remaining after allowed Class 5 claims will be distributed pro-rata between allowed Class 4 and Class 5 claims.

**Class 6.**    **Interests of Equity Holders**.  Class 6 consists of the interests of the shareholders of the Debtor. Jack T. Shannon Jr. shall retain his shareholder interest but shall not receive any distribution on account of such interest unless and until Class 4 and Class 5 creditors are paid in full. Class 6 is impaired.

**C.**    **Means for Implementation of the Plan.**  On the Effective Date, the Processing Agreement between the Debtor and ATCO shall be assumed pursuant to 11 U.S.C. § 365. The Debtor shall continue to operate its business and perform the Processing  Agreement.  Jack T. Shannon, Jr. shall remain as President and Chief Executive Officer of the Reorganized Debtor. The Debtor shall make payments to each class of creditors to the extent required under the Plan

14

out of its existing cash, future Cash Flow, and capital infusions, if any, made to Debtor by a third party as necessary to satisfy Plan payments.

The Debtor shall retain the right to market and sell the assets of the Reorganized Debtor during the term of the Processing Agreement. If, upon the expiration of the Processing Agreement, the Debtor has not been successful in entering into an asset purchase agreement with ATCO with respect to the Debtor's business and assets, or, ATCO fails to exercise its right to make a first offer on the Facility pursuant to the terms of the Processing Agreement, the Reorganized Debtor, after consultation with Triumph Bank, will retain the services of third party professionals, such as investment bankers, realtors and/or auctioneers to assist in the sale of the Debtor's business and assets. The Debtor shall liquidate the remaining assets of the business and distribute the sale proceeds in accordance with this Plan.

On the Effective Date, all property of the Estate shall revest in the Debtor free and clear of all claims, liens, encumbrances, and interests of creditors or Interest holders, except as provided in the Plan, the Confirmation Order or other applicable order of the Court.

Confirmation of the Plan shall constitute entry of a Discharge pursuant to 11 U.S.C. § 1141. The discharge shall (1) void any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under 11 U.S.C. § 1141 and (2) operate as an injunction to permanently enjoin creditors from the commencement or continuation of any action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the Debtor.

     **D.**       **<u>Provisions for the Assumption or Rejection of Executory Contracts and Unexpired Leases</u>**.

1.    **Assumed Executory Contracts and Unexpired Leases**.  The Debtor assumes
the following executory contracts and/or unexpired leases upon the Effective Date of the Plan:

    (i)      The Processing Agreement with ATCO;

    (ii)     Schedule 9 of the forklift lease with TICF.

2.    **Rejected Executory  Contracts and Unexpired Leases.**  To the extent not
previously rejected or expired post-petition by its own terms, the Debtor rejects the following
pre-petition executory contracts and unexpired leases upon the Effective Date:

    (i)      Airgas USA, LLC

    (ii)     Great America Financial Services Corporation

All other pre-petition executory contracts and unexpired leases which exist between the Debtor and any individual or entity, whether such contracts are written or oral, which have not heretofore been assumed or rejected or heretofore been approved by Orders of the Court are hereby specifically rejected; provided, however, that this provision is not intended to reject nor shall it be deemed to reject any agreement for the renewal or extension of any loan of funds, presently binding and in effect as between Debtor and any secured creditor. A proof of a claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than thirty (30) days after the date of the order confirming this Plan.

## IV.

## LIQUIDATION ANALYSIS

As stated in this Disclosure Statement, this liquidation analysis, as of February 28, 2020 has been prepared to indicate the values which may be obtained by impaired Classes of Claims and impaired Interests if the assets of the Debtor were sold pursuant to a Chapter 7 liquidation. A

copy of the Debtor's liquidation analysis is attached hereto as **Exhibit 2** and incorporated herein by reference.

The "liquidation value" of the Debtor consists primarily of the proceeds from a sale of the Debtor's assets.  The proceeds from a chapter 7 liquidation that would be available to all holders of unsecured claims would be reduced by the costs and expenses of liquidation and post petition claims of the Debtor' during the liquidation period.  Administrative expenses would include any unpaid Chapter 11 administrative expenses plus Chapter 7 administrative expenses which would include the fees and commissions of a trustee and of counsel and other professionals (including financial advisors and accountants) retained by the trustee, asset disposition expenses and claims arising during the chapter 7 case.  For purposes of this analysis, the Debtor has assumed that substantially all of the Debtor's assets in liquidation would be subject to the security interest of Triumph Bank and that there would be little or no equity in such assets for a Chapter 7 Trustee to liquidate and distribute to creditors. In all likelihood, a Chapter 7 trustee would abandon all encumbered assets to permit the secured creditors to foreclose on their security. In a Chapter 7 liquidation, all going concern value to the Debtor's business would be lost.

The liquidation itself could trigger certain priority claims and could accelerate other priority payments that otherwise would be due in the ordinary course of business.  Secured and priority claims would have to be paid in full out of the liquidation proceeds before the balance would be made available to pay unsecured claims or to make any distributions in respect to interests. **In a Chapter 7 liquidation, Triumph would be entitled to liquidate its remaining collateral. It is estimated that in the event of a forced liquidation, assets would not be**

17

**sufficient to satisfy the secured claim  of Triumph and unsecured creditors would receive no distribution on their claims**

This analysis is provided solely to disclose to holders of claims and interests the effects of a hypothetical chapter 7 liquidation of the Debtor, subject to the assumptions set forth in the analysis.  In confirming the Plan, the Bankruptcy Court will decide whether the Plan provides a greater recovery for creditors and interest holders than a liquidation of the Debtor under a chapter 7 (the "best interests test").  In doing so, the Bankruptcy Court will make its own finding as to the liquidation value of the Debtor.  The Debtor' liquidation analysis was prepared to assist the Bankruptcy Court in making this determination and should not be used for any other purpose.

The liquidation analysis is based on assumptions and estimates that, although considered reasonable by the Debtor, are inherently subject to significant uncertainties and contingencies beyond the control of the Debtor.  Accordingly, there can be no assurance that the results shown would be realized if the Debtor was liquidated and actual results in such a case could vary materially from those presented.  If actual results were lower than those shown, or if the assumptions used in formulating the liquidation analysis were not realized, distributions to each member of each class of claims could be adversely affected.

**V.**

**<u>OTHER MATTERS</u>**

The Debtor believes that the Plan of Reorganization submitted in this case is in the best interest of creditors and, in the event the Plan is not confirmed and the Debtor is forced to liquidate, unsecured creditors would receive a dividend of approximately -0- (-0-%) percent of their claims.  This is based upon the fair market value vs. liquidation value of the collateral as compared to the liens against the collateral.

18

A.    **Litigation Disclosure.**  The Debtor is not aware of any payments to creditors made within ninety (90) days of the Petition Date that are recoverable under sections 542, 543, 544, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code.   The Debtor and Reorganized Debtor shall retain the right to pursue all pre-petition causes of action and all avoidance actions against third parties.

B.    **Certain Tax Consequences.**  Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, could change the federal income tax consequences of the Plan and the transactions contemplated therein. Furthermore, certain significant federal income tax consequences of the Plan are subject to uncertainties due to the complexity of the Plan and the federal tax system. The Debtor assumes no responsibility for the tax effect that Confirmation and receipt of any distribution under the Plan may have on any given creditor or party in interest.

**NO RULING HAS BEEN SOUGHT OR OBTAINED FROM THE IRS WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN OBTAINED BY THE PLAN PROPONENTS WITH RESPECT THERETO. NO REPRESENTATIONS OR ASSURANCES ARE BEING MADE WITH RESPECT TO FEDERAL INCOME TAX CONSEQUENCES AS DESCRIBED HEREIN. CERTAIN TYPES OF CLAIMANTS AND INTEREST HOLDERS MAY BE SUBJECT TO SPECIAL RULES NOT ADDRESSED IN THIS SUMMARY OF FEDERAL INCOME TAX CONSEQUENCES. FURTHER, STATE, LOCAL OR FOREIGN TAX CONSIDERATIONS MAY APPLY TO A HOLDER OF A CLAIM OR INTEREST WHICH ARE NOT ADDRESSED HEREIN. BECAUSE THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND MAY VARY BASED ON INDIVIDUAL CIRCUMSTANCES, EACH HOLDER OF A CLAIM OR INTEREST AFFECTED BY THE PLAN MUST CONSULT, AND RELY UPON, HIS OR HER OWN TAX ADVISOR REGARDING SPECIFIC TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO THAT HOLDER'S CLAIM OR INTEREST. THIS INFORMATION MAY NOT BE USED OR QUOTED IN WHOLE OR IN PART IN CONNECTION WITH THE OFFERING FOR SALE OF SECURITIES.**

1.    **Tax Consequences to the Debtor.**  Under the IRC, a taxpayer generally must include in gross income the amount of any discharge of indebtedness income realized during the

taxable year. Section 108(a) (1) (A) of the IRC provides an exception to this general rule, however, in the case of a taxpayer that is under the jurisdiction of the bankruptcy court in a case brought under the Bankruptcy Code where the discharge of indebtedness is granted by the court or is pursuant to a Plan approved by the court, provided that the amount of discharged indebtedness that would otherwise be required to be included in income is applied to reduce certain tax attributes of the taxpayer. Section 108(e) (2) of the IRC provides that a taxpayer shall not realize income from the discharge of indebtedness to the extent that satisfaction of the liability would have given rise to a deduction.  As a result of § 108(a) (1) (A) and § 108(e) (2) of the IRC, the Debtor does not anticipate that it will recognize any taxable income from the discharge of any indebtedness through the Chapter 11 Case. Reductions in tax attributes (net operating loss carryover) will occur to the extent of cancellation of indebtedness income not recognized due to the above.

Under § 1141 of the Bankruptcy Code, confirmation of the Plan will discharge the Debtor from all debts except as provided for in the Plan. Implementation of the Plan, including the possible liquidation of the Debtor may result in discharge of indebtedness to the Debtor as a matter of tax law to the extent of any unsatisfied portion of such Claims. Any such discharge of indebtedness should not be included in gross income of the Debtor, however, because of the exceptions to such inclusion discussed above.

**2.**    **Tax Consequences to Creditors.**    A creditor who receives cash or other consideration in satisfaction of any Claim may recognize ordinary income. The impact of such ordinary income, as well as the tax year for which the income shall be recognized, shall depend upon the individual circumstances of each Claimant, including the nature and manner of organization of the Claimant, the applicable tax bracket for the Claimant, and the taxable year of

the Claimant. Each Creditor is urged to consult with its tax advisor regarding the tax implications of any payments or distributions under the Plan.

In general, the principal federal income tax consequences of the Plan to holders of Claims will be (a) recognition of loss or a bad debt deduction to the extent that the total payments received under the Plan with respect to the Claim are less than the adjusted basis of the holder of such claim, or (b) recognition of taxable income by the holder of the Claim to the extent of the excess of the amount of any payments made under the Plan in respect of the Claim over the holder's adjusted basis therein.

Common examples of holders of Claims who may recognize income upon receipt of payments under the Plan include (a) former employees with Claims for services rendered while serving as employees of a Debtor, (b) trade creditors whose claims represent an item not previously reported as income (including Claims for lost income upon rejection of leases or other contracts with the Debtor), (c) holders of Claims who had previously claimed a bad debt deduction with respect to their Claims in excess of their ultimate economic loss, and (d) holders of Claims that include amounts of pre-petition interest that had not previously been reported in income. Common examples of Claims who may recognize a loss or deduction for tax purposes as a result of implementation of the Plan, provided that such holders are not paid in full, include holders of Claims that arose out of cash actually loaned or advanced to a Debtor, and holders of Claims consisting of items that were previously included in income of such holders on the accrual method of accounting, to the extent, in both cases, that the economic loss to such holders has not been allowed as a tax deduction in a prior year.

The amount and character or any resulting income or loss recognized for federal income tax consequences to a holder of any Claim as a result of implementation of the Plan will,

however, depend on many factors. The most significant of these factors include (a) the nature

and origin of the Claim, (b) whether the holder is a corporation, (c) the extent to which the Plan

provides for payment of the particular Claim, (d) the extent to which any payment made is

allocable to pre-petition interest which is part of such Claim, and (e) the prior tax reporting

positions taken by the holder with respect to the item that constitutes the Claim. As to the last

factor, relevant tax reporting positions include whether the holder had to report under its method

of accounting any portion of the Claim (including accrued and unpaid interest) as income prior to

receipt and whether the holder previously claimed a bad debt or worthless deduction with respect

to the Claim, which would affect the adjusted basis of the holder in the Claim General rules for

the deduction of bad debts are provided in I.R.C. § 166 as follows:

> If either (a) the creditor's corporation, or (b) the debt is a business bad debt in the hands of the creditor, and the creditor demonstrates that the debt is collectible only in part, a deduction for partial worthlessness of the debt will be allowed to the extent that the debt is charged off in the accounting records of the creditor.

> For a creditor not described in the previous paragraph, a bad debt deduction is allowable only in the year that the debt becomes wholly worthless.

> If the creditor is not a corporation and the debt is a non-business bad debt, the bad debt deduction is treated as a short-term capital loss, which can offset only capital gain income and a limited amount of ordinary income.

> For purposes of I.R.C. § 166, a "non-business debt" means a debt other than (i) a debt created or acquired in connection with the creditor's trade or business, or (ii) a debt the loss from the worthlessness of which was incurred during the operation of the creditor's trade or business.

> The time as of which a debt becomes worthless (or partially worthless), and therefore the tax year in which a creditor may claim a bad debt deduction, is a question of fact.  Pursuant to income tax regulations ("Regs") § 1.166-2(c), as a general rule, bankruptcy is an indication of the worthlessness of at least a part of an unsecured, non-priority debt.  In bankruptcy cases, a debt may become worthless before settlement in some instances, and only when settlement and bankruptcy has been reached in other instances.  The mere fact that bankruptcy proceedings instituted against the debtor are terminated in a later year, thereby confirming the conclusion that the debt is worthless (or partially worthless), does

not necessarily shift the deduction to such later year. Thus, even though the precise amount the holders of General Unsecured Claims or other Claims will receive under the Plan may not be known until the final distribution date, the determination of the precise amount that will be paid under the Plan with respect to a Claim, or that no amount will be paid, does not necessarily establish that any resulting bad debt deduction is properly allowable in the creditor's tax year in which the final distribution is made, rather than in an earlier year. Accordingly, to the extent that a Creditor may claim a bad debt deduction which it has not previously claimed, it is possible that the Creditor will be required to amend its return for a prior year and claim the deduction in that year, rather than in the year in which the final distribution is made. Creditors should consult with their individual tax advisors with respect to this issue.

The extent to which gain or loss may be recognized by a holder of a Claim upon implementation of the Plan may be significantly affected by any bad debt deduction that may have been claimed by the holder in a prior year with respect to the debt on which the Claim is based. If the holder took a bad debt deduction in a prior year which is recovered in whole or in part through a payment made to the holder pursuant to the Plan, the holder will generally be required to include in income the amount recovered in the year the holder receives the payment. An exception to this rule permits exclusion of a recovery of a prior bad debt deduction to the extent that the earlier bad debt deduction did not produce a tax benefit to the holder.

**THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR CONSULTATION WITH A TAX ADVISOR. THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST. ACCORDINGLY, EACH HOLDER HAVING A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH HIS OR HER OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.**

**THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR. THE DEBTOR STRONGLY RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.**

C.     **Certain Risk Factors**. As with any business, there are various factors which may affect financial success. The following list represents some, but not necessarily all, of the major factors which should be evaluated in assessing risks. **THIS IS NOT, NOR IS IT INTENDED**

**TO BE, A COMPLETE LISTING OF ALL RELEVANT RISK FACTORS RELATING**

**TO THE DEBTOR'S PLAN.**

1. <u>Inflation</u>. Inflation may cause prices and expenses to rise over the life of the Plan at a faster level than already projected.

2. <u>Technology.</u> Technology may change faster than the company can keep up with or may cause the current state of the business to become obsolete.

3. <u>Economic Conditions-</u> The company is reliant on stable economic conditions such as the price of gasoline or interest rates. The Company or its customers could experience economic conditions that cause severe changes to its projections.

4. <u>Increased Competition-</u> The Debtor's future subscriber level may be affected by increased competition which may make difficult to pass along price increases or to attract or maintain customers.

5. <u>Trade Tariffs-</u> The Debtor's cash flow projections are based upon projected revenue from the Processing Agreement based on current market conditions. The hardwood lumber industry has been severely impacted by U.S. trade tariffs affecting the Chinese market. The Chinese market is a significant export partner for U.S. hardwood producers. There is no certainty that trade tariffs will be eased, eliminated or tightened during the term of the Plan.

6. <u>Coronavirus Impact-</u> At present, the Chinese economy is being adversely affected by the coronavirus outbreak. This has caused reduced manufacturing activity with a direct impact on supply chain vendors. The impact of the coronavirus on the hardwood lumber industry is uncertain.

**D.**     **Failure of Plan.**   If this Plan shall fail and cannot be modified to achieve acceptance and confirmation, then it is likely that the Debtor's case would be either dismissed or converted to a case under chapter 7 of the Bankruptcy Code, in which case it is unlikely that any distribution would be made to unsecured creditors.

**E.**     **Modification of Plan.**   The Debtor reserves the right to modify or amend this Plan prior to confirmation pursuant to 11 U.S.C. § 1127(a).   Further, the Debtor reserves the

right to seek modification of the Plan after confirmation in accordance with the provisions of 11 U.S.C. § 1127(e).

     **F.**    **Objections to Claims.**  The Debtor reserves the right to object to any claim filed or deemed to be filed in this case at any time.

     **G.**    **Sources of Information.**  All factual information utilized in this Disclosure Statement, including but not limited to value of assets, the amount of Claims, projections and historical financial information concerning the Debtor was provided by the Debtor, or derived from the claims register maintained by the Bankruptcy Court and from the Debtor's internal books and records.

     **H.**    **Attorneys' Disclaimer.**  This Disclosure Statement and any statement of income, cash flow pro-formas, expenses, assets, liabilities or valuations of property contained herein or elsewhere in documents filed with the Court in this bankruptcy case are based upon records and information supplied by the Debtor herein.  We do not represent that we have independently checked or verified the accuracy of any of this information.  Accordingly, no opinion is expressed by us as counsel for the Debtor as to the information contained in this Disclosure Statement.

     **I.**    **Conclusions and Recommendations.**  For the reasons set forth in this Disclosure Statement, the Debtor believes that the Plan provides the Debtor's unsecured creditors with the maximum possible dividend on their claims under the circumstances and is preferable to all other alternatives.  Accordingly, the Debtor urges you to vote to **ACCEPT** the Plan and to duly complete and return your Ballot such that it is **ACTUALLY RECEIVED** on or before 5:00 p.m. on _____.

Dated: March 19, 2020

**DEBTOR-IN-POSSESSION**

**J.T. SHANNON LUMBER COMPANY, INC.**

**By:** /s/ Jack T. Shannon, Jr.
         Jack T. Shannon, Jr.
         President/ CEO

**GLANKLER BROWN, PLLC**

/s/ Michael P. Coury
Michael P. Coury (MS 103809)
6000 Poplar Avenue
Suite 400
Memphis, TN 38119
(901) 576-1886
(901) 525-2389 facsimile
mcoury@glankler.com
***Attorneys for J.T. Shannon Lumber Company, Inc.***

4843-7013-7015, v. 1